UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KELLEY O'NEIL'S INC., IRISH ROSE SALOON INC., ANNA O'BRIEN'S INC., O'TOOLE'S IRISH PUB INC., AND  DOS KALBOS ENTERPRISES LLC, IN THEIR INDIVIDUAL CAPACITIES AND ON BEHALF OF THOSE SIMILARLY SITUATED;<br>                    Plaintiffs,<br>     vs.<br>DAVID Y. IGE, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF HAWAII; CLARE E. CONNORS, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF HAWAII;  STATE OF HAWAII, KIRK CALDWELL, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY AND COUNTY OF HONOLULU; AND  CITY AND COUNTY OF HONOLULU,<br>                    Defendants. | CIV. NO. 20-00449 LEK-RT |

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

On October 20, 2020, Plaintiffs Kelley O'Neil's Inc., Irish Rose Saloon Inc., Anna O'Brien's Inc., O'Toole's Irish Pub Inc. , and Dos Kalbos Enterprises, LLC (collectively "Plaintiffs") filed their Complaint.  [Dkt. no. 1.]  Also on October 20, 2020, Plaintiffs filed their Motion for Preliminary Injunction ("Motion").  [Dkt. no. 6.]  On November 24, 2020 Defendants David Ige, Clare E. Connors, and the State of Hawai`i (collectively "the State") filed  their memorandum in opposition to the Motion ("State Opposition"), [dkt. no. 22,] and

Defendants Kirk Caldwell and the City and County of Honolulu (collectively "the City") filed their memorandum in opposition to the Motion ("City Opposition"), [dkt. no. 21]. On December 7, 2020 Plaintiffs filed their reply. [Dkt. no. 25.] On December 16, 2020, the Court held a hearing on the Motion.

The Complaint was filed as a putative class action. Plaintiffs allege that

> [t]he putative Class consists of all bars and venues holding a Class 2, 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, or 18 liquor license, as defined by the Rules of the Liquor Commission of the City and County of Honolulu, who have been shut down by Defendant Governor Ige's Proclamations and Defendant Mayor Caldwell's executive orders since March 18, 2020.

[Complaint at ¶ 61.] Some businesses were deemed essential and allowed to remain open, while others, including Plaintiffs' businesses, were not. See id. at ¶¶ 45-46. Plaintiffs assert that the State and City "orders and proclamations do not provide a pre- or post- deprivation remedy to question 'essential' or to determine whether Plaintiffs can open with the same health related protocols as the 'essential' businesses allowed to open." [Id. at ¶ 46.] "There was a list of businesses that were allowed to remain open for on-premises operations and that classification was neither reasonable nor rational, but rather random and unsupported by data, and therefore a denial of due process." [Id. at ¶ 47.]

2

On December 17, 2020, an entering order was issued informing the parties of the Court's ruling on the Motion. [Dkt. no. 29.]  The instant Order supersedes that entering order.  Plaintiffs' Motion is respectfully denied.  The Court fully acknowledges with a heavy heart the emotional and economic toll Plaintiffs' members and shareholders must be faced with as they watch their businesses be shuttered by the City and State governments while others are allowed to remain open in a limited or greater capacity.  However, as explained more fully below, the City and State have considerable discretion in crafting their response to a public health emergency, such as the COVID-19 pandemic, and are responsible for protecting the health of all residents in the City and County of Honolulu ("Honolulu") and the State of Hawai`i ("Hawai`i").  Therefore, the Court cannot conclude that Plaintiffs are entitled to the extraordinary injunctive relief sought.

## BACKGROUND

COVID-19 is a worldwide respiratory illness caused by the coronavirus SARS-CoV-2.  [State Opp., Decl. of Sarah K. Kemble, M.D. ("Kemble Decl.") at ¶ 4.[1]]  The United States

---

[1] Dr. Kemble is "currently employed as the Acting State Epidemiologist with the Disease Outbreak Control Division ('DOCD') of the State of Hawai`i Department of Health ('DOH')." [Kemble Decl. at ¶ 1.]  In that capacity, her duties are to "oversee the DOCD and . . . direct[] all DOH activities relating
(. . . continued)

Department of Health and Human Services identified COVID-19 as a public health emergency on January 31, 2020, and the World Health Organization declared COVID-19 to be a global pandemic on March 11, 2020.  [Id. at ¶ 5.]  As of November 22, 2020, globally there had been more than 58 million confirmed cases and over 1.3 million confirmed deaths, [id. at ¶ 6 (citing https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740f d40299423467b48e9ecf6),] in the United States more than 11.8 million confirmed cases and over 250,000 deaths, [id. (citing Kemble Decl., Exh. 2,[2]] and in Hawai`i, there had been 17,098 confirmed cases and 231 deaths, [id. at ¶ 7 (citing https://health.hawaii.gov/coronavirusdisease2019/)].  As of February 25, 2021, there have been 112,959,383 cases and 2,506,088 deaths worldwide.  Johns Hopkins University of Medicine, Coronavirus Resource Center, Global Map, https://coronavirus.jhu.edu/map.html (last visited Feb. 25, 2021).  Also, according to the Centers for Disease Control and Prevention ("CDC"), as of February 25, 2021, there have been 28,138,938 cases and 503,587 deaths in the United States.  CDC,

---

to emerging infections, disease surveillance and investigations, and immunizations."  [Id. at ¶ 3.]

    [2] Exhibit 2 is a printout, dated November 22, 2020, of the CDC COVID Data Tracker, "United States COVID-19 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_deathsper100k.

COVID Data Tracker, United States COVID-19 Cases and Deaths by State, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited Feb. 25, 2021). Finally, in Hawai`i, as of February 25, 2021, there have been 26,493 cases and 432 deaths.  Id.

According to Dr. Kemble, COVID-19 spreads through the expulsion of respiratory droplets by an infected person, such as through talking or sneezing, and the droplets can remain suspended in the air for hours and can travel far.  [Kemble Decl. at ¶ 10 (citing https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html).]  Airborne transmission occurs in situations such as those involving enclosed spaces, prolonged exposure to particles created by activities like singing or shouting, and inadequate ventilation. [Id. at ¶ 11 (citing https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html).]  COVID-19 is also spread through touch, including personal contact (such as handshakes) or touching a surface that has  the virus on it, followed by touching one's face.  [Id. at ¶ 12 (citing N van Doremalen, et al., Aerosol and surface stability of HCoV-19 (SARS-CoV-2) compared to SARS-CoV-1, The New England Journal of Medicine, DOI: 10.1056/NEJMc2004973 (2020)).]  The symptoms of COVID-19 can range from asymptomatic to severe, and can lead to "cardiac arrhythmias, rhabdomyolysis, coagulopathy, and septic

5

shock." [Id. at ¶ 13 (citing
https://www.nejm.org/doi/full/10.1056/NEJMcp2009575?query=featur
ed_coronavirus).]

On March 4, 2020, Governor Ige and Mayor Caldwell
issued their first proclamations related to the virus.  Office
of the Governor, State of Hawai`i, Proclamation,
https://governor.hawaii.gov/wp-content/uploads/2020/03/2003020-
GOV-Emergency-Proclamation_COVID-19.pdf; . Office of the Mayor,
City and County of Honolulu, Proclamation, COVID-19 [Novel
Coronavirus],
https://www.honolulu.gov/rep/site/may/may_docs/Proc_of_Emergency
_or_Disaster_COVID19_03042020.pdf.  Governor Ige issued a number
of supplementary proclamations.  In the Third Supplementary
Proclamation, Governor Ige ordered that "all persons within the
State of Hawai`i are ordered to stay at home or in their place
of residence" except for a limited number of reasons, including
work in essential businesses or operations.  Office of the
Governor, State of Hawai`i, Third Supplementary Proclamation,
https://governor.hawaii.gov/wp-content/uploads/2020/03/2003162-
ATG_Third-Supplementary-Proclamation-for-COVID-19-signed.pdf, at
2.  Bars and nightclubs were not included in the list of
essential businesses or operations.  Id. at 2-6.  Through the
Thirteenth Proclamation, which is addressed in the Motion, bars
and nightclubs have not been allowed to reopen.  See generally

6

Office of the Governor, State of Hawai`i, Thirteenth
Proclamation Related to the COVID-19 Emergency, dated 9/22/20,
https://governor.hawaii.gov/wp-content/uploads/2020/09/2009139-
ATG_Thirteenth-Supplementary-Proclamation-for-COVID-19-
distribution-signed.pdf ("Thirteenth Proclamation").  Governor
Ige issued additional proclamations since the Motion was filed,
but, bars and nightclubs remained closed under all subsequent
proclamations.  See e.g., Office of the Governor, State of
Hawai`i, Eighteenth Proclamation Related to the COVID-19
Emergency, dated 2/12/21, https://governor.hawaii.gov/wp-
content/uploads/2021/02/2102078-ATG_Eighteenth-Proclamation-
Related-to-the-COVID-19-Emergency-distribution-signed.pdf.

     Mayor Caldwell, in turn, issued a series of
proclamations and orders supplementing his March 4, 2020
proclamation, including Emergency Order No. 2020-27, (COVID-19
[Novel Coronavirus]), Honolulu's COVID-19 Recovery Framework:
Order Implementing Tier 1 ("Order 27").  See
https://www.honolulu.gov/rep/site/may/may_docs/Emergency_Order_N
o._2020-27_certified_-_signed.pdf.  In Order 27, the City stated
that it had worked with experts from both the public sector and
the private sector to develop a plan for reopening, called

Honolulu's COVID-19 Reopening Framework ("HCRF"),[3] and started the City at Tier 1.[4]  Id. at 2.  In Order 27, the City also ordered that "[a]ll businesses with a facility in the City, except Essential Business, and Designated Businesses and Operations, are required to cease all activities within such facilities, except Minimum Basic Operations."  [Id. at 3.]  The City included in the definition of "Essential Businesses" "[r]estaurants and other facilities that prepare and serve food, but only for delivery or carry out."  [Id. at 11.]  Similarly, the City included in the definition of "Designated Businesses and Operations"

> Restaurants provided groups are limited to five (5) or fewer persons from the same household or living unit, occupancy is limited to no more than fifty percent (50%) of the maximum occupant load of the facility or room at issue, and conditions at http://ww.oneoahu.org/reopening/#restaurants are followed.  Penalties for violations of any of these provisions are set forth at http://ww.oneoahu.org/reopening/#restaurants.

---

[3] The HCRF is available at https://www.honolulu.gov/rep/site/may/may_docs/Honolulus_COVID19_Recovery_Framework.pdf.

[4] The HCRF is a tier-based recovery framework.  The gist of the framework is that, as COVID-19 cases decrease, businesses and services would gradually reopen.  Tier 1 is identified as "representing a high level of community spread that is testing the limits of the public health system to test, contact trace, and isolate/quarantine; and puts some strain on the healthcare system."  HCRF at 1.

Order 27, Exh. A (Designated Businesses and Operations) at 2 (emphasis in original).  In contrast to restaurants, bars and nightclubs were to remain closed through Tier 3, and only reopen at Tier 4 with special restrictions.  HCRF at 9.  The tier level is determined by two metrics; to reach Tier 4, first, the seven day average of new cases reported in Honolulu needs to be less than twenty, and second, the seven day average percent of the positive tests needs to be less than one percent.  HCRF at 2.

On February 22, 2021, Mayor Rick Blangiardi[5] issued the Emergency Order No. 2021-02 (COVID-19 [Novel Coronavirus]), Honolulu's COVID-19 Recovery Framework: Order Implementing Tier 3.  See https://www.honolulu.gov/rep/site/may/may_docs/2102128-CCH_Emergency_Order_No._2021-02_Implementing_Tier_3_part_1_certified_-_signed.pdf; https://www.honolulu.gov/rep/site/may/may_docs/2102128-CCH_Emergency_Order_No._2021-02_Implementing_Tier_3_part_2_certified_-_signed.pdf.  No City orders to date have allowed for the reopening of bars and nightclubs.

In the Complaint, Plaintiffs acknowledge that government officials are granted deference when making time-

---

[5] Mayor Blangiardi succeeded Mayor Caldwell.

9

sensitive decisions, [Complaint at ¶ 51,] but assert that "no rationale [] supports the decision to keep bars and nightlife venues closed," [id. at ¶ 54].  Therefore, Plaintiffs assert they have been deprived "of their liberty and property interests without due process."  [Id. at ¶ 57.]  Plaintiffs assert the following claims: a 42 U.S.C. § 1983 procedural due process claim pursuant to the Due Process Clause of the Fourteenth Amendment ("Count I"); a § 1983 substantive due process claim pursuant to the Due Process Clause of the Fourteenth Amendment ("Count II"); a § 1983 equal protection claim for violation of the Equal Protection Clause of the Fourteenth Amendment ("Count III"); an equal protection claim for violation of Article 1, § 5 of the Hawai`i State Constitution ("Count IV"); and a Fifth Amendment Takings Clause claim ("Count V").  In the instant Motion, Plaintiffs seek "a preliminary injunction enjoining the Defendants from enforcing the Governor's Thirteenth Supplementary Proclamation Related To The COVID-19 Emergency, or Mayor Caldwell's Executive Order No. 20-27 implementing the City and County of Honolulu's COVID-19 Recovery Framework[.]"  [Motion at 19.]

## **STANDARD**

This Court has described the standards that apply to a motion for a preliminary injunction as follows:

"[I]njunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008).  The standard for granting a preliminary injunction and the standard for granting a temporary restraining order are identical.  See Haw. Cnty. Green Party v. Clinton, 980 F. Supp. 1160, 1164 (D. Haw. 1997); Fed. R. Civ. P. 65.

Sakala v. BAC Home Loans Servicing, LP, CV. No. 10-00578 DAE-LEK, 2011 WL 719482, at *4 (D. Hawai`i Feb. 22, 2011) (alteration in original).

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)) (explaining that, "[t]o the extent that [the Ninth Circuit's] cases have suggested a lesser standard, they are no longer controlling, or even viable" (footnote omitted)); see also Winter, 129 S. Ct. at 374-76 (holding that, even where a likelihood of success on the merits is established, a mere "possibility" of irreparable injury is insufficient to warrant preliminary injunctive relief, because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

> Painsolvers, Inc. v. State Farm Mut. Auto. Ins.
> Co., 685 F. Supp. 2d 1123, 1128-29 (D. Hawai`i
> 2010) (footnote and some citations omitted)
> (alterations in original). The Ninth Circuit has
> held that its "serious questions" version of the
> sliding scale test for preliminary injunctions
> survives Winter to the extent that, a court may
> grant a preliminary injunction where the
> plaintiff (1) "demonstrates . . . that serious
> questions going to the merits were raised and the
> balance of hardships tips sharply in the
> plaintiff's favor[,]" and (2) satisfies the other
> Winter factors, likelihood of irreparable injury
> and that the injunction is in the public
> interest. Alliance for the Wild Rockies v.
> Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011)
> (citation and block quote format omitted) (some
> alterations in original).

Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 47 F. Supp.

3d 1069, 1075-76 (D. Hawai`i 2014) (alterations in Pac.

Radiation) (some citations omitted).  When the government is a

party, the last two factors, balance of equities and public

interest, merge.  Drakes Bay Oyster Co. v. Jewell, 747 F.3d

1073, 1092 (9th Cir. 2014).

## DISCUSSION

## I.   Likelihood of Success on the Merits

Plaintiffs argue that "Mayor Caldwell's rationale

constitutes random, arbitrary and unfair treatment, . .  [and]

there is no reasonable basis upon which to contend that bars

cannot appropriately manage their customers."  [Motion at 16.]

As this district court explained:

> Chief Justice Robert[s's] concurrence in
> South Bay United Pentecostal Church v. Newsom

informs the Court's analysis.  --- U.S. ----, 140
S. Ct. 1613, 207 L. Ed. 2d 154 [(2020)] (Roberts,
C.J., concurring).  Chief Justice Roberts
recognized that the "Constitution principally
entrusts '[t]he safety and the health of the
people' to the politically accountable officials
of the States 'to guard and protect.'"  Id.
(quoting Jacobson v. Massachusetts, 197 U.S. 11,
38, 25 S. Ct. 358, 49 L. Ed. 643 (1905))
(alteration in original).  The latitude of
officials "must be especially broad" when acting
"in areas fraught with medical and scientific
uncertainties."  Id. (quoting Marshall v. United
States, 414 U.S. 417, 427, 94 S. Ct. 700, 38 L.
Ed. 2d 618 (1974)).  If officials do not exceed
these broad limits, "they should not be subject
to second-guessing by an 'unelected federal
judiciary,' which lacks the background,
competence, and expertise to assess public health
and is not accountable to the people."  Id. at
1613-14 (quoting Garcia v. San Antonio Metro.
Transit Auth., 469 U.S. 528, 545, 105 S. Ct.
1005, 83 L. Ed. 2d 1016 (1985)).  This is
particularly true when "a party seeks emergency
relief in an interlocutory posture, while local
officials are actively shaping their response to
changing facts on the ground."  Id. at 1614.  In
such circumstances, "[t]he notion that it is
'indisputably clear' that the Government's
limitations are unconstitutional seems quite
improbable."  Id.

          . . . .

     According to Jacobson, the liberties secured
by the Constitution do "not import an absolute
right in each person to be, at all times and in
all circumstances, wholly freed from restraint.
There are manifold restraints to which every
person is necessarily subject for the common
good."  Jacobson, 197 U.S. at 26, 25 S. Ct. 358.
It is a "fundamental principle that persons and
property are subjected to all kinds of restraints
and burdens in order to secure the general
comfort, health, and prosperity of the state."
Id. (citation and internal quotations marks
omitted).  When an epidemic of disease threatens

the safety of a community's members, it "has the right to protect itself." Id. at 27, 25 S. Ct. 358.  And commensurate with that right is a state's authority "to enact quarantine laws and health laws of every description." Id. at 25, 25 S. Ct. 358 (internal quotations marks omitted).

[Governor Ige]'s Emergency Proclamations — purporting to protect public health during the COVID-19 pandemic — are not susceptible to Plaintiffs' constitutional challenges unless they have "no real or substantial relation to" the crisis or are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Jacobson, 197 U.S. at 31, 25 S. Ct. 358 (citations omitted).  Indeed, "Jacobson instructs that **all** constitutional rights may be reasonably restricted to combat a public health emergency." In re Abbott, 954 F.3d 772, 786 (5th Cir. 2020).  And "the judiciary may not 'second-guess the state's policy choices in crafting emergency public health measures.'" In re Rutledge, 956 F.3d 1018, 1029 (8th Cir. 2020) (quoting Abbott, 954 F.3d at 784).

Carmichael v. Ige, 470 F. Supp. 3d 1133, 1141–43 (D. Hawai`i 2020) (emphasis in Carmichael) (footnote omitted).

## A.   Real or Substantial Relation to Public Health

Plaintiffs do not contend that the orders and proclamations have no real or substantial relation to public health.  Instead, the crux of Plaintiffs' argument is that requiring bars and nightclubs to shut down while allowing other businesses, such as restaurants that have bars in them, to remain open is "random, arbitrary and unfair treatment." See Motion at 16.

"'The problems of government are practical ones and may justify, if they do not require, rough accommodations — illogical, it may be, and unscientific.'" Heller v. Doe by Doe, 509 U.S. 312, 321 (1993) (some citations omitted) (quoting Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69-70 (1913)). "True, even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation." Id. The City and the State have provided sufficient explanation of the substantial relationship between the closure of bars and nightclubs and the protection of public health. Hirokazu Toiya, the City's Director of the Department of Emergency Management, explained that the decision to require the closure of bars and nightclubs and allow other businesses to remain operational was made after lengthy deliberation. [City Opp., Decl. of Hirokazu Toiya ("Toiya Decl.") at ¶¶ 2, 13.] Based on input from Dr. Kemble, Kaua`i District Health Officer Dr. Janet Berreman, and current State Health Director (who, at the time, was a volunteer) Dr. Libby Char, the City considered, inter alia: the ability to accommodate the wearing of face masks at all times; physical distancing; exposure duration; ventilation concerns; limiting activities known to increase spread (such as singing or shouting); and the enforceability of the restrictions. [Id. at ¶¶ 14-15.] Based on these factors, the City concluded that bars and nightclubs presente an

15

increased risk because: people cannot simultaneously drink and
wear a face covering; people from different household socialize
in bars; bars are loud due to music, causing people to raise
their voices; bars serve alcohol, which caused an increased
concern that patrons would not follow COVID-19 protocols; and
bar patrons would be more difficult to contact-trace due to
intermingling and customers' reluctance to provide the necessary
information. [Id. at ¶ 15.]  The City and State also concluded
that bars and nightclubs present increased risks compared to
restaurants. [Id. at ¶ 17.]  Dr. Kemble similarly explained
that the decision to close bars and nightclubs and not close
other establishments was because bars and nightclubs were known
to be high-risk areas for COVID-19 because: people in bars and
nightclubs socialize; cannot wears masks while drinking; move
around; are more likely to sing, shout, cheer and raise their
voices which transmits increased respiratory droplets; and the
consumption of alcohol is likely to lower inhibition and
decrease likelihood of following COVID-19 protocols.  [Kemble
Decl. at ¶ 30.]

    The relationship between the factors identified as
conducive to COVID-19 transmission and situations generally
identified with bars and nightclubs has at least a footing in
reality.  Based on the reasoned analysis provided by the
representatives for the City and the State, the Court finds that

16

the restrictions in question have a real or substantive relation to public health.

## B.   **Invasion of Rights Secured by the Constitution**

The second inquiry is whether the City and State Orders and Proclamations are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]" See Jacobson, 197 U.S. at 31.

### 1.   **Count I – Procedural Due Process**

"To obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process." Shanks v. Dressel, 540 F.3d 1082, 1090 (9th Cir. 2008) (brackets, citation, and quotation marks omitted). Plaintiffs assert that they have protected liberty and property interests that are being infringed upon because they are "being[] denied the right to operate their bars," [Complaint at ¶ 76,] and "[n]either Governor Ige nor Mayor Caldwell provided any procedural due process before issuing the executive shutdown Orders and Proclamations," and no procedures are in place to provide for post-deprivation due process, [id. at ¶ 77].

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process

17

Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976).  However, the United States Supreme Court has recognized that "summary administrative action may be justified in emergency situations." Hodel v. Vir. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 300 (1981) (citations omitted).  "Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action.  Indeed, deprivation of property to protect the public health and safety is one of the oldest examples of permissible summary action." Id. (brackets, citations, and internal quotation marks omitted).  The COVID-19 pandemic is, without a doubt, a public health emergency. Therefore, the orders and proclamations at issue are precisely the types of government action permitted in response to an emergency.

Similarly, the due process clause does not prohibit every intrusion into protected interests. Halverson v. Skagit Cnty., 42 F.3d 1257, 1260 (9th Cir. 1994), *as amended on denial of reh'g* (Feb. 9, 1995).  "[W]hen the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law." Id. (citations omitted). Accordingly, the Ninth Circuit has "determined also that governmental decisions which affect large areas and are not

18

directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." Id. at 1261 (citations omitted).  The City's Orders and the State's Proclamations affect large areas and are not directed at one or few individuals, and therefore do not give rise to the constitutional requirements of individual hearing and notice.  Therefore, the Plaintiffs are unlikely to succeed on the merits with respect to Count I.[6]

### 2. Count II – Substantive Due Process

As this district court previously noted,

> The substantive component of the Due Process Clause of the Fourteenth Amendment "protects certain individual liberties from state interference." Franceschi v. Yee, 887 F.3d 927, 937 (9th Cir. 2018) (alteration in original) (citations omitted).  "[O]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." Id. (citation omitted).  Therefore, substantive due process is "largely confined to protecting fundamental liberty interests, such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply

---

[6] The Court acknowledges persuasive analysis with respect to Halverson as to whether a similar government order qualified as legislative action.  See Bols v. Newsom, Case No. 20cv873-BEN (BLM), 2021 WL 268609, at *5 (S.D. Cal. Jan. 26, 2021).  However, given the lack of Ninth Circuit authority and the disparate procedural postures between Bols and the instant Motion, see, Bols, 2021 WL 268609, at *1, the Court finds that Plaintiffs are unlikely to succeed on the merits with respect to Count I.

> rooted in this Nation's history and tradition.'"
> Id. (citations omitted); see also Engquist v. Or.
> Dep't of Agric., 478 F.3d 985, 996 (9th Cir.
> 2007) ("A threshold requirement to a substantive
> or procedural due process claim is the
> plaintiff's showing of a liberty or property
> interest protected by the Constitution."
> (citation omitted)).

Carmichael, 470 F. Supp. 3d at 1147-48 (alteration in

Carmichael).  Furthermore,

> [r]estrictions on selecting and pursuing work are
> recognized by the Fourteenth Amendment's Due
> Process Clause.  "It requires no argument to show
> that the right to work for a living in the common
> occupations of the community is of the very
> essence of the personal freedom and opportunity
> that it was the purpose of the [Fourteenth]
> Amendment to secure." Truax v. Raich, 239 U.S.
> 33, 41, 36 S. Ct. 7, 60 L. Ed. 131 (1915)
> (citations omitted).  More recently, the Supreme
> Court stated that "the Fourteenth Amendment's Due
> Process Clause includes some generalized due
> process right to choose one's field of private
> employment." Conn v. Gabbert, 526 U.S. 286, 291-
> 92, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999);
> see also Ry. Employees' Dep't v. Hanson, 351 U.S.
> 225, 234, 76 S. Ct. 714, 100 L. Ed. 1112 (1956)
> ("[T]he right to work, which the Court has
> frequently included in the concept of 'liberty'
> within the meaning of the Due Process Clauses may
> not be denied by the Congress." (citations
> omitted)); Schware v. Bd. of Bar Exam'rs, 353
> U.S. 232, 238-39, 77 S. Ct. 752, 1 L. Ed. 2d 796
> (1957); Terrace v. Thompson, 263 U.S. 197, 215,
> 44 S. Ct. 15, 68 L. Ed. 255 (1923) (protecting
> the "right to earn a livelihood by following the
> ordinary occupations of life"); Dittman v.
> California, 191 F.3d 1020, 1029 (9th Cir. 1999).

> However, as we recognized in Dittman, 191
> F.3d at 1031 n.5, the Court has never held that
> the right to pursue work is a fundamental right.
> The Court has stated that the "generalized" right
> to choose one's employment "is nevertheless

> subject to reasonable government regulation."
> Conn, 526 U.S. at 292, 119 S. Ct. 1292.  Our
> court has described the judicial review which
> applies to laws infringing on nonfundamental
> rights as a very narrow one.  "[W]e do not
> require that the government's action actually
> advance its stated purposes, but merely look to
> see whether the government **could** have had a
> legitimate reason for acting as it did."
> Wedges/Ledges [of Cal., Inc. v. City of Phoenix],
> 24 F.3d [56,] 66 [(9th Cir. 1994)] (emphasis in
> original). . . .

Sagana v. Tenorio, 384 F.3d 731, 742–43 (9th Cir. 2004)(emphasis

and some alterations in Sagana).

In light of the controlling precedent, Plaintiffs'

claim for substantive due process violation fails because there

are legitimate reasons the State and the City closed the bars

and nightclubs.  Given the health expert analysis that bars

present an increased risk of COVID-19 transmission compared to

other businesses, in light of distancing concerns, ventilation

concerns, the increased spread of respiratory droplets, and the

risk of decreased compliance with protocols dues to alcohol

consumption, see, e.g., Kemble Decl. at ¶¶ 11-12, 30, the Court

finds that legitimate reasons for the restrictions on bar

operations exist, and more importantly, that the City and the

State could have had a legitimate reason for closing the bars.

Therefore, Plaintiffs are unlikely to succeed with respect to

Count II.

3.   **Count III - Equal Protection under the Fourteenth Amendment**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982)).

In analyzing Equal Protection claims, our "first step . . . is to identify the state's classification of groups." Country Classic Dairies, Inc. v. Milk Control Bureau, 847 F.2d 593, 596 (9th Cir. 1988). Once we have identified a classified group, we look for a control group, Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995), composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy, Ariz. Dream Act Coal. v. Brewer, 855 F.3d 957, 966 (9th Cir. 2017). If the two groups are similarly situated, we determine the appropriate level of scrutiny and then apply it. Id. at 969.

Gallinger v. Becerra, 898 F.3d 1012, 1016 (9th Cir. 2018) (alteration in Gallinger).

The classified group is bar owners in Honolulu, the control group is owners of restaurants with bars in Honolulu, and all restaurants and bars outside of Honolulu. See Complaint at ¶ 101. Given that no fundamental interest is implicated, see Sagana, 384 F.3d at 743, the appropriate level of scrutiny is rational basis review. See U. S. Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973) ("Under traditional equal protection

analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." (citations omitted)).  "In applying rational-basis review, [the Court is] free to consider any 'legitimate governmental interest' the State has in" restricting bar operations.  See Gallinger, 898 F.3d at 1018  (citing Moreno, 413 U.S. at 534, 93 S. Ct. 2821.)

        Plaintiffs argue that it is arbitrary for the State and the City to close bars in Honolulu while other establishments that serve alcohol remain operational.  However, the declarations of the health and emergency response experts are persuasive, as the decision was apparently based on consideration of the specific factors conducive to transmission to COVID-19, such as the inability to use face coverings while drinking, poor ventilation, mingling of households, situations where people raise their voices, and the prevalence of those circumstances in bars more than other types of businesses.  See e.g., Toiya Decl. at ¶ 15.  It follows that limiting access to the types of environments that are more likely to allow for the spread of COVID-19 furthers the legitimate government interest of protecting public health.  Therefore, the Court finds that the State and City orders and proclamations closing bars bear a rational relationship to a legitimate government interest and, Plaintiffs are unlikely to succeed on Count III.

4.   __Count IV – Equal Protection under State Law__

Plaintiffs argue that, while "the right to contract is not necessarily a fundamental right under the US Constitution, the State of Hawaii holds otherwise by including the right to acquire and possess property as a fundamental right in Section 2 of its Bill of Rights." [Motion at 11.]  Thus, Plaintiffs appear to be asserting that they have in a fundamental property right to contract under state law.  While the Hawai`i Supreme Court has

> acknowledged "the liberty of [a] citizen to
> choose and pursue an innocent occupation[,]"
> Territory v. Kraft, 33 Haw. 397, 408 (1935),
> "[it] has already held that the right to work is
> not fundamental and that, therefore, only the
> rational basis test applies."  Nagle[v. Bd. of
> Educ.], 63 Haw. [389,] 399, 629 P.2d [109,] 116
> [(1981)] (citations omitted); accord, Daoang v.
> Department of Education, 63 Haw. 501, 504, 630
> P.2d 629, 631 (1981); Maeda v. Amemiya, 60 Haw.
> 662, 669, 594 P.2d 136, 141 (1979); Ross[v.
> Peters], 846 P.2d [1007,] 1115 [(Okla. 1993)]
> ("[T]he cluster of interests in state licensing
> of professionals is not per se viewed as a
> fundamental right which demands strict
> scrutiny.").
>
> "Under the rational basis test, we inquire
> as to whether a statute rationally furthers a
> legitimate state interest."  Estate of Coates v.
> Pacific Engineering, a Div. of Pacific Lining
> Co., Inc., 71 Haw. 358, 364, 791 P.2d 1257, 1260
> (1990). . . .

Applications of Herrick, 82 Hawai`i 329, 346, 922 P.2d 942, 959 (1996) (some alterations in Herrick) (footnote omitted).

As with previous Counts, Plaintiffs argue the decision to close bars is unlawful because it constitutes arbitrary treatment.  However, as with Plaintiffs' claims under the Fourteenth Amendment, the experts employed by the City and the State demonstrate that the decision was based on circumstances prevalent in bars and the transmission of COVID-19, and therefore constitutes a rational basis because closure furthers the legitimate government interest of protecting public health.  See e.g., Toiya Decl. at ¶ 15.  Therefore, Plaintiffs are unlikely to succeed with respect to Count IV.

## II.  <u>Irreparable Harm Absent Preliminary Relief</u>

There is Ninth Circuit case law supporting Plaintiffs' position that the reasonable fear of being put out of business satisfies the irreparable harm requirement for a preliminary injunction.  In <u>hiQ Labs, Inc. v. LinkedIn Corp.</u>, the Ninth Circuit stated:

> "[M]onetary injury is not normally considered irreparable." <u>Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League</u>, 634 F.2d 1197, 1202 (9th Cir. 1980).  Nonetheless, "[t]he threat of being driven out of business is sufficient to establish irreparable harm." <u>Am. Passage Media Corp. v. Cass Commc'ns, Inc.</u>, 750 F.2d 1470, 1474 (9th Cir. 1985).  As the Second Circuit has explained, "[t]he loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm.  What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." <u>Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of</u>

> New York, Inc., 749 F.2d 124, 125-26 (2d Cir.
> 1984) (per curiam).  Thus, showing a threat of
> "extinction" is enough to establish irreparable
> harm, even when damages may be available and the
> amount of direct financial harm is ascertainable.
> Am. Passage Media Corp., 750 F.2d at 1474.

938 F.3d 985, 993 (9th Cir. 2019) (alterations in hiQ Labs).  In

hiQ Labs, there was evidence that the threatened loss of

business was more than "purely hypothetical."  Id. (stating

that, after hiQ Labs received a cease-and-desist letter from

LinkedIn, the financing round that hiQ Labs was going through

stalled, and hiQ Labs lost several employees).

There is no dispute that the closure of Plaintiffs'

businesses constitutes a threatened loss that is more that

purely hypothetical.  This factor weighs in favor of granting

Plaintiff's Motion.

## III. **Balance of the Equities and Public Interest**

"A plaintiff seeking a preliminary injunction must

establish . . . that the balance of equities tips in his favor,

and that an injunction is in the public interest."  Winter, 555

U.S. 7, 20 (2008) (citations omitted).

> When the reach of an injunction is narrow,
> limited only to the parties, and has no impact on
> non-parties, the public interest will be "at most
> a neutral factor in the analysis rather than one
> that favor[s] [granting or] denying the
> preliminary injunction."  See Bernhardt v. L.A.
> County, 339 F.3d 920, 931 (9th Cir. 2003).  If,
> however, the impact of an injunction reaches
> beyond the parties, carrying with it a potential
> for public consequences, the public interest will

26

be relevant to whether the district court grants
the preliminary injunction.  See Sammartano v.
First Judicial Dist. Court, 303 F.3d 959, 965
(9th Cir. 2002) ("'In cases where the public
interest is involved, the district court must
also examine whether the public interest favors
the plaintiff.'") (alteration omitted) (quoting
Fund for Animals v. Lujan, 962 F.2d 1391, 1400
(9th Cir. 1992)); see also Golden Gate Rest.
Ass'n v. City & County of S.F., 512 F.3d 1112,
1126 (9th Cir. 2008).  "[When] an injunction is
asked which will adversely affect a public
interest . . . the court may in the public
interest withhold relief until a final
determination of the rights of the parties,
though the postponement may be burdensome to the
plaintiff."  Weinberger v. Romero-Barcelo, 456
U.S. 305, 312–13, 102 S. Ct. 1798, 72 L.Ed.2d 91
(1982).  In fact, "courts . . . should pay
particular regard for the public consequences in
employing the extraordinary remedy of
injunction."  Id. at 312, 102 S. Ct. 1798.

Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138–39 (9th Cir.

2009) (alterations in Stormans).

In no uncertain terms, the closure of parts of

Hawaii's economy has weighed heavily on the conscience of every

member of the Honolulu community.  The City and the State have

forced bar and nightclub owners to bear an extraordinary, and

indeed, unequal burden in the COVID-19 response.  While some

businesses are allowed to remain open, even businesses that bear

a striking resemblance to Plaintiffs' own, Plaintiffs have been

shuttered by government action, to the great loss of the owners,

employees, customers, community, and Honolulu and Hawai`i

themselves.  To that end, the Court expresses its deepest

27

sympathy to all those who have suffered losses from the closures, as well as from COVID-19.

Understandably, Plaintiffs are frustrated with the closures.  However, the closures "need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19."  See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125, 129 (6th Cir. 2020) (citing Heller, 509 U.S. at321, 113 S. Ct. 2637).  Also, although bars and nightclubs are clearly not the only source of COVID-19 transmission, and it is not the case that every feature which the health experts were concerned with will be present in every bar, the law does not demand a perfect response to equally address every component of every ailment.  It is enough that City and the State have attempted to apply a remedy to one part of the identified problem.  See Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 489 (1955) ("The legislature may select one phase of one field and apply a remedy there, neglecting the others." (citation omitted)).  Furthermore,

> [s]haping the precise contours of public health measures entails some difficult line-drawing.  Our Constitution wisely leaves that task to officials directly accountable to the people.  South Bay, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring) (citing Jacobson, 197 U.S. at 38, 25 S. Ct. 358) (observing that where the "broad limits" of rational basis review "are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess

> public health and is not accountable to the
> people"). Even if imperfect, the Governor's Order
> passes muster under the rational basis test.

Indep. Fitness Facilities, 814 F. App'x at 129 (citation

omitted). Here, as other district courts have determined, the

Court is not is a position to second guess the elected officials

charged with responding to public health emergencies. See,

e.g., Talleywhacker, Inc. v. Cooper, 465 F. Supp. 3d 523, 543

(E.D.N.C. 2020). The State and the City faced a decision with

potentially tremendous loss on both sides. The State and the

City made the decision to close some types of businesses in

effort to slow the spread of a deadly virus. Neither the Court

nor Plaintiffs are in a position to undermine those decisions.

Therefore, the final two factors weigh against granting the

Motion.

In conclusion, Plaintiffs' Motion is denied because,

at this point, they are not likely to succeed on the merits, and

although they may have shown irreparable harm, the balance of

the equities and public interest weigh against issuance of a

preliminary injunction.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for

Preliminary Injunction, filed October 20, 2020, is HEREBY

DENIED.

IT IS SO ORDERED.

29

DATED AT HONOLULU, HAWAII, February 26, 2021.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

KELLEY O'NEIL'S INC., ET AL. VS. DAVID Y. IGE, ET AL; CV 20-00449 LEK-RT; ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION